### 32247. McDERMID *et al. v.* H. & V. BUILDERS INC.

Decided March 15, 1949.

*J. Ralph McClelland Jr., George & John L. Westmoreland,* for plaintiffs.

*B. Hugh Burgess, McLennan & Cook,* for defendant.

MACINTYRE, P. J. The defendants filed no demurrers to the petition, and the petition is subject to more than one construction. Under one construction, the plaintiffs' action is for the

breach of an express oral contract under the terms of which the defendants were to advance the cost of all *water* connections for the fifty-five lots in the subdivision and the plaintiffs were to advance the cost of all *sewer* connections for the fifty-five lots, following which the plaintiffs were to reimburse the defendant for the cost of twenty-five of the water connections and the defendant was to reimburse the plaintiffs for the cost of thirty of the sewer connections. Under another construction of the petition, the action is in the nature of an implied assumpsit in that it is alleged that the defendant, with full knowledge of the facts, accepted and utilized to its exclusive benefit the advantage of connecting the plumbing from each of its thirty houses to the sewer when the plaintiffs had paid for the sewer connections or tap-ins. Therefore, since the allegations of the petition leave it uncertain as to which theory is being pursued by the plaintiffs, in the absence of a special demurrer pointing out this formal defect, the plaintiffs may recover under either theory if there is evidence to support such theory. *Stoddard* v. *Campbell*, 27 *Ga. App.* 363 (108 S. E. 311) ; *Payton* v. *Gulf Line Ry. Co.*, 4 *Ga. App.* 762 (62 S. E. 469).

The documentary evidence introduced consisted of: the contract between the plaintiffs and the defendant covering the sale of the thirty lots by the plaintiffs to the defendant, this contract being dated, "this _____ of April, 1944," and signed by M. F. Brice as attorney in fact of the plaintiffs, and signed by Earnest Harrison, president, and J. W. Venable, secretary, on behalf of H. & V. Builders Inc.; the contract between the City of Hapeville and H. & V. Builders Inc., this contract being dated, "this the 29 day of April, 1944," and signed on behalf of the city by its mayor and city clerk and on behalf of H. & V. Builders Inc. by its president, Earnest Harrison, and its secretary, J. W. Venable, just above the signatures for H. & V. Builders Inc., the name, Lawton Miller, appearing, though Miller is not named in the contract as a party, a check drawn by M. F. Price in favor of A. Lawton Miller in the amount of $1375, and bearing a notation in the upper left-hand corner, "55 sewer taps Hapeville at $25.00," this check being dated "5/13--1944," and carrying Mr. Miller's indorsement, together with the stamp of the Atlanta Clearing House. There also appears a receipt of the City of Hapeville

to Lawton Miller for $1375 for "55 sewer taps." This receipt is dated "5-3-44." There is also a check drawn on the Happy Homes Inc., account in the Brice Banking Company, by Dewey D. Scarboro, secretary, in the amount of $1037.50, payable to Earnest Harrison, and bearing the notation, "refund to H. & V. Contractors." This check is dated July 12, 1944, and bears the indorsement of Earnest Harrison and the stamps of East Atlanta Bank and First National Bank of Atlanta.

M. F. Brice testified that he was the duly authorized representative of the plaintiffs to handle the transaction in dispute in this case. He identified the contract between the plaintiffs and the defendant, covering the sale of thirty lots to the defendant, and stated: "As to the circumstances surrounding this purchase and sale of property and what was outlined and what I undertook to do about the transaction after it occurred—we purchased the property in Hapeville, Georgia, and then it was apparent probably that we would build elsewhere, over in Buckhead; and H. and V. Builders were looking for a location, and we agreed to sell them thirty lots; they had thirty homes to build. . . At that time there was a good deal of hesitation about this kind [sic] of houses that were to be built, and there was a good bit of difficulty in getting permits from the City of Hapeville for building these houses; . . they [the City Council of Hapeville] agreed to issue permits, provided we would pay for the building permits, water taps and sewer taps in advance, and that was done, and I purchased the property; it was purchased from Mr. Lawton Miller, and he met with City Council. I don't know of my own knowledge what he did. I talked to him later, and he told me; I discussed the matter with him. I discussed it with the defendants about this same time; not on that date, I didn't. It was later discussed, about what was done at the Council meeting. . . I had already purchased this property from Mr. Lawton Miller at Hapeville. I was selling the defendant corporation these thirty lots on which they were to build thirty houses. Under the terms of this contract, in undertaking to prepare that property for them, we agreed that the streets, in line with the agreement we had with the City, in connection with the City and County too, streets and curbings would be put in, and water and sewers stubbed to the property.

line. As to what I said before about the City of Hapeville—you had to enter into a contract for the work on the streets and sewers, and so forth, and they wanted the sewer taps and water meters and building permits paid in advance. That was a necessary requirement before we could start laying out the streets and curbing, and before they would enter into an agreement to participate in it. . . The City insisted on that agreement before they would let us go ahead; they insisted that this money be paid. That [contract] is between the City of Hapeville and Lawton Miller and H. & V. Builders. I had no part in that contract, I was not a party to it; I was working to take the lots over from Mr. Miller. But this contract [with the City] had to be signed before I could go ahead with my work. Subject to the provisions of this contract [with the City?] advances were made by me. An advance of $1375 was made for the sewer taps. I think that was all the advances that were made [by me?]. . . The reason there were fifty-five sewer taps instead of thirty for the lots I sold the defendant, was because there were fifty-five lots in the plot. I still had twenty-five lots left at that time and I paid for the entire fifty-five taps. The check you show me is the check I gave to Mr. Miller, refunding him the money, reimbursing him for his check, for payment as shown by this receipt you show me. At the time of these advances I made, advances were made by H. & V. Builders to the City under the terms of the contract. They advanced for the building permits and water connections for fifty-five lots; and I advanced for fifty-five sewer connections. I reimbursed H. & V. Builders for twenty-five water connections they paid for on my twenty-five lots. You ask why at the time of reimbursement by me to them [the defendant] they did not reimburse me for the thirty sewer connections. Well, Mr. Scarborough [sic] handled the matter, and it was all done before I knew anything about it; he had given the direction to cover the amount. He did not know all the facts. You ask me if Mr. Scarborough [sic] was acting for me or someone else. Well, Mr. Scarborough [sic] owned some stock in the company, and he had no active part in the building operations; but he said H. & V. Builders were very insistent on getting their money back, and that he paid them without asking what they owed us. . . I later made demand on

H. and V. Builders for reimbursement on this item, I wrote them about it. I don't remember the date I wrote them, but during the progress of the deal and program of construction. It was shortly after this contract was entered into that you have; sometime after the first of May. . . I never did have any conversation with either Mr. Harrison or Mr. Venable about when we would have a general accounting of what was due me and what was due them. I have never been reimbursed this $750 by anyone. Houses were later constructed on the thirty lots by H. and V. Builders. They were not required to pay City of Hapeville or anybody else anything additional for tapping into the sewer that was stubbed to the property line; I know that they were not, because it was all paid by me prior to that time."

Earnest Harrison was called as a witness by the plaintiffs for purposes of cross-examination, and testified in part as follows: "We signed an option with Mr. Lawton Miller for this property, and Mr. Miller went to these meetings, and I don't know how long he worked out there; I wasn't at any of the meetings and I don't know what they did; and he finally got them to okay it, so we could buy permits and water meters . . and he fixed this contract up himself, I understand Mr. Miller did; and Mr. Venable and myself went out there with him, and he told us that he had control of the lots, and while we could get those permits, it would be favorable for us to take them all, and he would get the other twenty-five houses to build; then we issued permits for the water meters, and permits just on the contract, and I called in my builder. In building any house or anything in the City, you have to deal with them direct; they will not accept anybody else's money. Both Mr. Venable and I knew how this transaction was being handled by Mr. Miller, and knew he was making arrangements with the City Council on these terms; but the agreement was . . just a signed agreement to get the permits and things before they changed their minds. You say, under this contract here, H. and V. Builders did advance the sum of $3427.50 [sic] [$3437.50?] for fifty-five water connections. We didn't issue any for that. We issued permits for meters at $37.50 apiece. We advanced money for all fifty-five of them. . . I didn't know anything about Mr.

Brice at that time. I hadn't contracted to buy but thirty lots. I wasn't interested in the other twenty-five. He [Miller?] said they were handled through him. I was interested later, but at that time I had no interest in them. Later on, Mr. Brice did not refund to me $37.50 for each of the twenty-five lots. I don't know whether Mr. Scarborough [sic] was acting for him or not. But I was reimbursed that amount for the twenty-five lots. I knew at that time Mr. Miller had advanced $1375 for fifty-five sewer connections; I was with him. . . H. and V. Builders did go ahead and build these thirty houses on the lots. . . I was never called upon by the City of Hapeville to pay again this $25 fee. You say we tapped into the sewer that had been stubbed to the property line. The plumber did; they [the plaintiffs?] had to take care of that. I imagine Mr. Brice had laid out the streets and laid the sewer in and stubbed the sewer to the property line. You say we tapped in without additional charge. They [the plaintiffs?] tapped at the property line, which was supposed to be done. . . I had a contract with the plaintiffs where they agreed to pay at their expense the complete consideration of installation of sewer and water. I never did authorize Mr. Lawton Miller to advance money for me. . . The only time I ever had any agreement with Mr. Brice or any conversation with him was that this thing was completely closed through Mr. Miller."

We do not think that the foregoing evidence establishes a prima facie case under the theory that the action was one upon an express oral contract. It appears that both Mr. Miller and the defendant made advance payments to the City of Hapeville; Mr. Miller advanced $1375 for sewer tap-ins, and Mr. Brice, the attorney in fact of the plaintiffs, reimbursed Mr. Miller for this amount. It does not appear whether Mr. Miller's payment to the city was made by agreement with the defendant or not, but if it was so made, the evidence completely fails to show that Mr. Miller in making the agreement and payment did so in any capacity on behalf of the plaintiffs or under any duty to them, as their agent or otherwise.

Nor do we think that the evidence established a prima facie case under the construction that the action is based upon an implied assumpsit. There is evidence that Miller paid the

advances to the city for the sewer tap-ins, that he did so with the knowledge and consent of the defendant, and that the defendant did tap in on these sewers when they knew or should have known that they were not entitled to this privilege of tapping in on the sewers without payment to the city by someone. Nothing more appearing, this would have been such conduct as in equity and good conscience to require the defendant to make reimbursement to the proper parties. However, in the absence of a showing that Miller paid the money for the use of the plaintiff—and the burden was upon the plaintiffs to make this showing (Blake *v.* Corcoran, 211 Mass. 406, 97 N. E. 1002)—the plaintiffs failed to establish their case under the theory of an implied assumpsit. It does not appear from the evidence whether Miller made the payment for his, the defendant's, or the plaintiffs' benefit, and the fact that the plaintiffs reimbursed Miller does not alter the situation.

The court, therefore, did not err in granting the motion for a nonsuit.

*Judgment affirmed. Gardner and Townsend, JJ., concur.*